## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

| | | |
|---|---|---|
| In re: Curneall Watson & Leona Watson, | ) | Bankruptcy No. 2009-10002 |
| | ) | Chapter 13 |
| Debtor. | ) | |
| | ) | |
| In re: Caledonia Springs, Inc., | ) | Bankruptcy No. 2009-10003 |
| | ) | Chapter 13 |
| Debtor. | ) | |
| | ) | |
| CURNEALL WATSON and LEONA BRADY | ) | |
| WATSON, | ) | |
| | ) | |
| Plaintiffs/Appellants, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:2011-0012 |
| | ) | Civil Action No. 3:2011-0058 |
| LLP MORTGAGE, LTD., | ) | |
| | ) | |
| Defendant/Appellee. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Intervenor. | ) | |

**Attorneys:**
**Martial A. Webster, Esq.,**
St. Croix, U.S.V.I.
    *For Appellants*

**Warren B. Cole, Esq.,**
St. Croix, U.S.V.I.
    *For Appellee LLP Mortgage, Ltd.*

**Cathy Tran Moses, Esq.,**
Washington, D.C.
**Angela Tyson-Floyd, Esq.,**
St. Croix, U.S.V.I.
    *For Intervenor United States of America*

<u>**MEMORANDUM OPINION**</u>

**Lewis, Chief Judge**

THIS MATTER comes before the Court on the appeals of Plaintiffs/Appellants Curneall Watson and Leona Brady Watson (collectively, "the Watsons") from three orders entered in jointly administered Chapter 7 bankruptcy proceedings by the Bankruptcy Division of the District Court of the Virgin Islands ("Bankruptcy Court"). The first Order, dated October 8, 2010, approved the procedures for the bankruptcy trustee's sale at auction of real property belonging to the estates of Debtors Curneall Watson, Leona Brady Watson, and Caledonia Springs, Inc. ("Debtors"). The second Order, dated January 6, 2011, confirmed the sale of the property to Defendant/Appellee LLP Mortgage, Ltd. ("LPP Mortgage"). The third Order, dated May 12, 2011, directed the Watsons to vacate the property and provided that LPP Mortgage could have all writs necessary to evict them. For the reasons discussed below, the Court will affirm the rulings of the Bankruptcy Court.

## I.      BACKGROUND

The instant appeals represent the latest stage in the litigation between the Debtors and LPP Mortgage, dating from 2002, when LPP Mortgage sued the Debtors seeking a judgment for amounts due on a series of loan transactions, and foreclosure against the properties securing those loans. (*See* 02-cv-0172, Dkt. No. 1; Dkt. No. 132 at 1-2). LPP Mortgage obtained a judgment against the Debtors on November 6, 2007. (02-cv-0172, Dkt. No. 133 at 5-13). A Marshal's Sale of the properties was scheduled for April 13, 2009. (02-cv-0172, Dkt. No. 182, Ex. 1 at 3).

On April 8, 2009, five days before the Marshal's Sale, the Watsons filed for Chapter 13 bankruptcy protection. (09-bk-10002, Dkt. No. 1). Caledonia Springs, Inc., filed for Chapter 11 reorganization protection on April 9, 2009. (09-bk-10003, Dkt. No. 1). As a result of the

bankruptcy filings, LPP Mortgage's debt and foreclosure action was automatically stayed. 11 U.S.C. § 362(a); (02-cv-0172, Dkt. No. 181). Ultimately, both bankruptcy cases were converted to Chapter 7 liquidation proceedings (09-bk-10002, Dkt. No. 35; 09-bk-10003, Dkt. No. 25) and, on November 12, 2009, the Bankruptcy Court ordered them to be jointly administered under docket number 09-bk-10003. (09-bk-10002, Dkt. No. 36; 09-bk-10003, Dkt. No. 24).[1]

In June 2010, the Chapter 7 Trustee moved for an order authorizing the sale of the Debtors' assets. (Dkt. No. 35).  On October 8, 2010, the Bankruptcy Court granted the motion and issued an "Order: (I) Authorizing Procedures for Sales of the Debtors' Assets; and (II) Approving Form of Notice of Sales of Assets Pursuant to 11 U.S.C. 105 and 363, Fed. Bankr. P. 6004 and LBR 6004-1" (the "Approval Order"), setting forth the procedures for the sale at auction of all real property of the combined bankruptcy estates. (Dkt. No. 53). The auction was held on December 2, 2010 and, according to the Trustee's Report of Sale filed on December 6, 2010, all four auctioned properties were purchased by LPP Mortgage via cash and credit bids, including Plots 101 and 106 of Estate Grove Place ("the Property") on St. Croix, U.S. Virgin Islands. (Dkt. No. 62). The Bankruptcy Court confirmed the sale on January 6, 2011 in an "Order of Confirmation of Trustee's Sale" ("Sale Order"). (Dkt. No. 73). The Watsons filed an appeal of the Sale Order on January 14, 2011 (Dkt. No. 74), docketed as Case Number 11-cv-0012 in the District Court.[2]

Pursuant to the sale, the Trustee issued a deed to the Property on January 12, 2011, which was recorded on March 29, 2011. (09-bk-10002, Dkt. No. 109-3). When the Watsons refused to

---

[1] For ease of reference, the Court will cite the docket numbers solely in 09-bk-10003, unless otherwise indicated.

[2] On February 9, 2011, the Watsons moved in the Bankruptcy Court to stay the Sale Order. (09-bk-10002, Dkt. No. 95). By Order entered on March 25, 2011, the Bankruptcy Court denied their motion to stay. (09-bk-10002, Dkt. No. 108).

relinquish possession of the Property (*see id.*, Dkt. No. 109-4), LPP Mortgage moved for an Order of Restitution and Issuance of Writ of Restitution, seeking an Order directing the Watsons to vacate the Property, and any writs necessary to effectuate that relief. (Dkt. No. 109). Following a hearing on May 12, 2011 (Dkt. No. 115), the Bankruptcy Court granted LPP Mortgage's motion that same day and entered an "Order of Restitution and Order for Issuance of Writs" ("Restitution Order"). (Dkt. No. 116). The Watsons appealed the Restitution Order on May 20, 2011. (11-cv-0058, Dkt. No. 1; Dkt. No. 117).[3]

The Watsons and LPP Mortgage filed their respective briefs in the appeal of the Sale Order on May 3 and 24, 2011. (11-cv-0012, Dkt. Nos. 31, 33). The parties filed their respective briefs in the appeal of the Restitution Order on July 5 and 11, 2011. (11-cv-0058, Dkt. Nos. 9, 10). On July 25 and 26, 2011, the United States of America moved to intervene in the appeals to address the constitutional challenges made by the Watsons to portions of the Bankruptcy Code. (11-cv-0058, Dkt. Nos. 14, 16). Following a status conference on July 29, 2011, the Court consolidated the two appeals, granted the United States' motion to intervene, and accepted the United States' brief. (11-cv-0058, Dkt. Nos. 18, 20); (*see* 11-cv-0058, Dkt. No. 17-1) (Brief by the United States of America as Intervenor).[4]

---

[3] On May 27 and 31, 2011, the Debtors filed in the District Court an Emergency Motion to Stay pending Appeal of the Sale Order (11-cv-0012, Dkt. No. 36) and the Restitution Order (11-cv-0058, Dkt. No. 3), which was denied on July 29, 2011. (11-cv-0012, Dkt. No. 46; 11-cv-0058, Dkt. No. 23). On August 3, 2011, the Third Circuit denied the Watsons' emergency petition for writ of mandamus requesting a stay of the Bankruptcy Court's Order confirming sale of the Property. (09-bk-10002, Dkt. No. 122).

[4] For ease of reference, because the briefs of both the Watsons and LPP Mortgage in both cases are similar, other than the specific sections relating to the respective Orders being appealed, the Court will cite the docket numbers solely from the appeal in 11-cv-0058, unless otherwise indicated.

## II.  STANDARD OF REVIEW

Some of the issues raised by the Watsons concern the Bankruptcy Court's and this Court's jurisdiction over the case below and this appeal, respectively. "'[I]t is familiar law that a federal court always has jurisdiction to determine its own jurisdiction.'" *White-Squire v. U.S. Postal Service*, 592 F.3d 453, 456 (3d Cir. 2010) (quoting *United States v. Ruiz*, 536 U.S. 622, 628 (2002)); *VeraSun Energy Corp. v. West Plains Co.* (*In re VeraSun Energy Corp.*), 2013 WL 3336870, at *2 (D. Del. June 28, 2013) (citing 28 U.S.C. §§ 157(a) and 1334(b)); *Chicot Cnty. Drainage Dist. v. Baxter State Bank*, 308 U.S. 371, 376-77 (1940).

As discussed below, the District Court of the Virgin Islands has jurisdiction to review the Orders of its Bankruptcy Division pursuant to 18 U.S.C. § 158(a). When a district court sits as an appellate court in a bankruptcy matter, it reviews the bankruptcy court's legal determinations *de novo*, its factual findings for clear error, and its exercise of discretion for abuse thereof. *See Official Comm. of Unsecured Creditors v. CIT Group/Business Credit Inc. (In re Jevic Holding Corp.)*, 787 F.3d 173, 179 (3d Cir. 2015); *Carroll v. Klingerman (In re Prosser)*, 2013 WL 5422881, at *2 (D.V.I. Sept. 27, 2013) ("[A] bankruptcy court's exercise of its equitable powers is reviewed only for an abuse of discretion.") (internal quotation and citation omitted).

## III.  DISCUSSION

### A.  General Constitutional and Jurisdictional Challenges

On appeal, the Watsons have raised numerous overlapping constitutional, jurisdictional, and statutory issues by way of nine identical arguments raised in both briefs which generally question whether the Bankruptcy Court was permitted to enter the Orders at issue, and whether the

District Court of the Virgin Islands has jurisdiction to review these appeals.[5] The Watsons also make several jurisdictional and merits-based arguments specific to the Bankruptcy Court's October 8, 2010 Approval Order, the January 6, 2011 Sale Order, and the May 12, 2011 Restitution Order.[6]

      LPP Mortgage's counter-statement of the issues reframes the Watsons' arguments; narrows the constitutional, jurisdictional, and statutory issues to three, and addresses some additional

---

[5] Those issues presented for review are: (1) whether "there even exists a Bankruptcy Court in the Virgin Islands since there is no Article III Court"; (2) whether "there is a right to have either [sic] an Article III judge rather than an Article III adjunct hear bankruptcy cases"; (3) whether "there is a right absent the availability of an Article III judge to hear bankruptcy cases to have such cases heard by a Judge appointed by the President and Confirmed by the Senate"; (4) whether "a Bankruptcy Judge may sit by designation of the Third Circuit in the Virgin Islands since there is no Article III District Court"; (5) whether "it violates the separation of powers in the United States Constitution for a Bankruptcy Judge as an Article III adjunct to sit in a non-Article III court"; (6) whether "a judge may sit in the District Court (including any Bankruptcy Court) of the Virgin Islands without having been appointed by the President and confirmed by the Senate"; (7) whether "any orders issued by a Bankruptcy Judge sitting in the Virgin Islands are void due to lack of legal authority to sit in the Virgin Islands"; (8) whether "there is a right to have a bankruptcy appeal heard by an Article III District Judge"; and (9) whether "there is a right to have a bankruptcy appeal by trial *de novo* before an Article III court or a judge appointed by the President [and] Confirmed by the Senate if the original judge was not an Article III judge or a judge appointed by the President and Confirmed by the Senate." (11-cv-0058, Dkt. No. 9 at 9-10).

[6] Those additional issues presented for review are: (1) whether "the sale should have been confirmed"; (2) whether "an eviction proceeding is a core proceeding"; (3) whether "the Bankruptcy Court even has jurisdiction statutorily and constitutionally under *Stern v. Marshall* to hear an eviction proceeding after a bankruptcy sale of property when the property is no longer property of the estate"; (4) whether "an eviction proceeding is properly heard by the Bankruptcy Court or the local courts of the Virgin Islands under comity and abstention"; and (5) whether "the right to jury trial under federal statutes incorporating the Seventh Amendment and Virgin Islands law applies in the Bankruptcy Court." (11-cv-0012, Dkt. No. 31 at 10; 11-cv-0058, Dkt. No. 9 at 10).

issues.[7] The United States, as Intervenor, focuses on the constitutional and jurisdictional issues raised by the Watsons.[8]

The Watsons' overarching contention is that the Bankruptcy Court lacked jurisdiction to issue the two Orders because allowing a non-Article III judge to issue Orders in a bankruptcy case violated their constitutional right to have an Article III judge decide their case, and because orders issued by a Bankruptcy Judge in the Virgin Islands are void due to lack of legal authority for such a Judge to sit there.

> **1. Whether the Watsons and Caledonia Springs, Inc. Are Entitled to the Adjudication of Their Bankruptcy Proceedings by an Article III Court**

Because the Watsons' arguments implicate the constitutionality of the entire bankruptcy system—which involves, in this case, the interplay between Articles I, III, and IV of the U.S. Constitution—as well as the constitutionality and jurisdictional authority of Bankruptcy Judges in

---

[7] LPP Mortgage's issues presented for review are: (1) whether "the [Watsons are] entitled to the adjudication of core bankruptcy proceedings by an Article III court"; (2) whether "there exist[s] a properly constituted Bankruptcy Division of the District Court of the Virgin Islands"; and (3) whether "the Hon. Mary F. Walrath [was] properly assigned by the Judicial Council of the Court of Appeals for the Third Circuit to sit as a Bankruptcy Judge in the District Court of the Virgin Islands." (11-cv-0058, Dkt. No. 10 at 7). On the merits, LPP Mortgage addresses: (1) whether the Watsons "preserve[d] their substantive objections to the confirmation of sale"; (2) whether "the Trustee's Sale conducted pursuant to 11 U.S.C. § 363 [was] properly approved, conducted, and confirmed"; (3) whether "the Bankruptcy Court [had] jurisdiction to enter a final order against [the Watsons] requiring restitution of real property that had been sold by the Trustee to [LPP Mortgage] when [the Watsons] refused to relinquish possession"; (4) whether "the Bankruptcy Court [was] required to abstain in favor of the Superior Court—where no case was pending in the Superior Court"; and (5) whether the Watsons "have a right to a jury trial in the restitution proceedings before the Bankruptcy Court." (11-cv-0012, Dkt. No. 33 at 6; 11-cv-0058, Dkt. No. 10 at 7).

[8] The United States divides the Watsons' arguments into two main areas: "The Issuance of the Bankruptcy Orders Was Constitutionally Proper; and "[The Watsons'] Challenges Based on Article III and Separation of Powers Fail on the Additional Ground that the Virgin Islands Is an Unincorporated Territory." Their first argument contains three subsets: "The Bankruptcy Court's Issuance of the Orders under 28 U.S.C. § 157(b) Did Not Violate Article III"; "The Bankruptcy Court's Issuance of the Orders under 28 U.S.C. § 155(a) also Did Not Violate Article III or the Separation of Powers"; and "[The Watsons] Are Not Entitled to Article III Review." (11-cv-0058, Dkt. No. 17-1 at ii).

the Virgin Islands and their authority to issue certain orders, it is necessary to provide an overview

of the bankruptcy structure and recent developments in bankruptcy jurisdiction as articulated by

the Supreme Court in *Stern v. Marshall*, 564 U.S. 462 (2011).

Federal bankruptcy jurisdiction is set forth in 28 U.S.C. § 1334. Section 1334(b) confers

upon district courts "original and exclusive jurisdiction of all cases under title 11," and "original

but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related

to cases under title 11." 28 U.S.C. § 1334(b). The Third Circuit has parsed the statute as follows:

> Bankruptcy jurisdiction extends to four types of proceedings: (1) cases "under" title
> 11, that is, the bankruptcy petition; (2) proceedings "arising under title 11"; (3)
> proceedings "arising in" a bankruptcy case; and (4) proceedings "related to" a case
> under title 11. 28 U.S.C. § 1334(b); *In re Combustion Eng'g, Inc.*, 391 F.3d 190,
> 225 (3d Cir. 2005). The first three categories are "core" proceedings in which the
> bankruptcy court has power to hear, decide, and enter orders and judgments. 28
> U.S.C. § 157(b)(1). The fourth category, "related to" proceedings, are "non-core"
> proceedings, which the bankruptcy court can hear, but in which it can only submit
> proposed findings of fact and conclusions of law to the district court, not issue
> orders. *Halper v. Halpe*r, 164 F.3d 830, 836 (3d Cir. 1999).

*In re Exide Techs*., 544 F.3d 196, 205 (3d Cir. 2008). The Third Circuit has further stated:

> A case "arises under" title 11 "if it invokes a substantive right provided by title 11."
> *Torkelsen v. Maggio (In re Guild & Gallery Plus, Inc.,),* 72 F.3d 1171, 1178 (3d
> Cir. 1996). Bankruptcy "arising under" jurisdiction is analogous to 28 U.S.C. §
> 1331, which provides for original jurisdiction in district courts "of all civil actions
> arising under the Constitution, laws, or treaties of the United States." 1 *Collier on
> Bankruptcy* § 3.01[4][c][i] at 3–21–22 (15th ed. rev. 2005); *see also Wood v. Wood
> (Matter of Wood),* 825 F.2d 90, 96-97 (5th Cir. 1987).[9] The category of proceedings
> "arising in" bankruptcy cases "includes such things as administrative matters,
> orders to turn over property of the estate and determinations of the validity, extent,
> or priority of liens." 1 *Collier on Bankruptcy* § 3.01[4][c][iv] at 3–31 (quotations
> and footnotes omitted). Proceedings "arise in" a bankruptcy case, "if they have no

---

[9] "A claim will 'arise under' title 11 if 'the Bankruptcy Code creates the cause of action or provides the substantive right invoked.'" *In re New Century TRS Holdings, Inc.*, 505 B.R. 431, 441 (Bankr. D. Del. 2014) (quoting *Stoe v. Flaherty*, 436 F.3d 209, 217 (3d Cir. 2006)). Put another way, "[b]y a grant of jurisdiction over all proceedings arising under title 11, the district courts will be able to hear any matter under which a claim is made under a provision of title 11. . . . [W]hen a cause of action is created by title 11, then that civil proceeding is one 'arising under title 11.'" 1 *Collier on Bankruptcy*, § 3.01[3][e][i].

existence outside of the bankruptcy." *United States Trustee v. Gryphon at the Stone Mansion, Inc.,* 166 F.3d 552, 556 (3d Cir. 1999). Finally, a proceeding is "related to" a bankruptcy case if "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *In re Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3d Cir. 1984); *see also In re Federal-Mogul Global, Inc.,* 300 F.3d 368, 381 (3d Cir. 2002) (noting that *Pacor* "clearly remains good law in this circuit" in this respect).

*Stoe v. Flaherty*, 436 F.3d 209, 216 (3d Cir. 2006).

Section 157(a) of the Bankruptcy Amendments and Federal Judgeship Act of 1984 (the "Act") provides that "any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district." 28 U.S.C. § 157(a). This statute "permits district courts to refer most matters to a bankruptcy court. This broad jurisdictional grant allows bankruptcy courts to deal efficiently and expeditiously with all matters connected with the bankruptcy estate." *In re Combustion Eng'g, Inc.*, 391 F.3d at 225 (internal quotation marks and citations omitted).

The manner in which a bankruptcy judge may act on a referred matter depends on the type of proceeding involved. Bankruptcy judges may "hear and enter final judgments in 'all core proceedings arising under title 11, or arising in a case under title 11.'" *Stern*, 564 U.S. at 474 (quoting 28 U.S.C. § 157(b)(1)). Core proceedings include, but are not limited to sixteen different types of matters, including "matters concerning the administration of the estate"; "orders approving the sale of property other than property resulting from claims brought by the estate against persons who have not filed claims against the estate"; and "other proceedings affecting the liquidation of the assets of the estate." 28 U.S.C. § 157(b)(2)(A), (N), & (O). If a bankruptcy judge determines that a referred proceeding is not a "core proceeding" but is "otherwise related to a case under title 11," the judge may only submit "proposed findings of fact and conclusions of law to the district court," 28 U.S.C. § 157(c)(1), which then is responsible for entering final judgment.

The Supreme Court's holding in *Stern* is key to this Court's adjudication of the constitutional and jurisdictional issues raised by the Watsons on appeal. *Stern* also provides a roadmap concerning how a court should analyze such claims.

In *Stern*, Vickie Lynn Marshall (also known as Anna Nicole Smith) ("Vickie"), filed for bankruptcy protection. One of Vickie's creditors, Pierce Marshall ("Pierce"), the son of Vickie's late husband, filed a proof of claim in that case, asserting that he should be able to recover damages from Vickie's bankruptcy estate because Vickie had defamed him by inducing her lawyers to tell the press that he had engaged in fraud in controlling his father's assets. Vickie counterclaimed, arguing that Pierce tortuously interfered with the receipt of an inter-vivos gift that she expected from her late husband. Vickie's counterclaim arose under state tort common law. Resolution of Pierce's proof of claim for defamation in the bankruptcy proceeding would not resolve the state law-based counterclaim which "raise[d] issues of law entirely different from those" raised by Pierce's proof of claim. *Id.* at 497. Thus, *Stern* involved a state-law counterclaim by the debtor that was completely unrelated to the creditor's claims against the estate or the underlying bankruptcy. *Carr v. New Century TRS Holdings, Inc. (In re New Century TRS Holdings, Inc.)*, 544 F. App'x 70, 73 (3d Cir. 2013).

The Supreme Court in *Stern* opined that although Section 157(b)(2)(C) of the Bankruptcy Code "permits the Bankruptcy Court to enter final judgment on Vickie's counterclaim, Article III of the Constitution does not." *Stern*, 564 U.S. at 482. The Court reviewed Article III jurisdiction, and the limits Article III placed on the jurisdiction of bankruptcy courts, and concluded that the bankruptcy court lacked authority under Article III to enter final judgment on the counterclaim because it was "in no way derived from or dependent upon bankruptcy law; it is a state tort action that exists without regard to any bankruptcy proceeding." *Id.* at 499. In reaching this conclusion,

the Supreme Court described the counterclaim as a state common law action "independent of the federal bankruptcy law and not necessarily resolvable by a ruling on the creditor's proof of claim in bankruptcy." *Id.* at 487. As such, it involved litigation of a "private right"—"the liability of one individual to another under the law," and which, therefore, required resolution by an Article III judge. *Id.* at 489. The Court contrasted cases involving private rights with cases involving "public rights" that "Congress could constitutionally assign to 'legislative' courts for resolution"—*i.e.* non-Article III courts. *Id.* at 485. Thus, only if a claim involved a "public right" could it be brought to final adjudication by a non-Article III judge such as a bankruptcy judge.

The analysis in *Stern* did not initially address whether the claim involved a private versus a public right to determine whether an Article III or non-Article III judge could constitutionally exercise jurisdiction over the claim. The Supreme Court indicated that a court should first assess whether a bankruptcy court may enter final judgment on a claim by first analyzing whether that court had the statutory authority under 28 U.S.C. § 157(b) to issue a final judgment. If so, it should *then* consider whether conferring that authority on the bankruptcy court was constitutional. *Id.* at 469.

Engaging in *Stern*'s two-step analysis, the Court concludes that the Bankruptcy Division of the District Court of the Virgin Islands had the requisite statutory and constitutional authority to enter the Orders at issue.

### a. Statutory Authority

The Watsons assert that the Bankruptcy Judge did not have jurisdiction to enter the Sale and Restitution Orders in this case because they concern non-core matters that must be adjudicated by an Article III Judge. This Court concludes that the Sale and Restitution Orders encompass core

matters, and that the Bankruptcy Court properly exercised statutory authority under § 157(b)(2) in entering them.

On January 4, 2011, the Bankruptcy Court entered the Sale Order. (09-bk-10003, Dkt. No. 73). The Order recited that the Chapter 7 Trustee offered for public sale on December 2, 2010 certain property of the Chapter 7 Bankruptcy Estates of the Watsons and Caledonia Springs, Inc.; that the Trustee filed a Report of Sale on December 6, 2010; that the property was struck off to LPP Mortgage for bids made in cash and by credit against its allowed secured claims; that the Court held a hearing on confirmation of the sale on December 9, 2010 where objections were heard and considered; and that, having been fully advised, the Court confirmed the sale and directed that the Trustee deliver Trustee's Deeds and Bills of Sale to LPP Mortgage for the properties sold. *Id.*

The Restitution Order, filed on May 12, 2011 (entered on May 19, 2011), derives from the Sale Order—specifically, the Watsons' failure to vacate Plots 101 and 106 of Estate Grove Place, which had been sold to LPP Mortgage, and the sale of which was confirmed by the Bankruptcy Court in the Sale Order. (09-bk-10002, Dkt. No. 116). The Restitution Order recounted that the Trustee sold certain real property to LPP Mortgage at a public auction on December 2, 2011, including the Estate Grove Place property; that the sale was confirmed by Order of the Court; that the Trustee delivered a deed to LPP Mortgage, which had been recorded; that the Debtors had no right to possession of the property; that LPP Mortgage was entitled to exclusive and peaceful possession free of any interference by the Debtors; but that the Debtors or persons claiming on their behalf remained in possession of the property, preventing LPP Mortgage from taking peaceful possession. *Id.* The Bankruptcy Court ordered the Debtors to remove their personal property and immediately vacate the property. The Order further provided that LPP Mortgage could have all

writs necessary to effect the Debtors' eviction by the United States Marshal, whose assistance could include the use of reasonable force as may be necessary to serve and enforce such writs. *Id.*

Section 704 of the Bankruptcy Code directs that a Chapter 7 Trustee shall: "collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interests of parties in interest." 11 U.S.C. § 704(1)(a). To aid in the liquidation of the debtor's assets, the trustee is authorized to sell property of the bankruptcy estate, subject to court approval after notice and hearing. *Id.* § 363(b)(1). "Court approval of the trustee's motion to sell is warranted when the trustee has demonstrated sound business judgment in requesting the sale." *In re Scimeca Foundation, Inc.*, 497 B.R. 753, 771 (E.D. Pa. 2013). "[G]reat judicial deference is given to the Trustee's exercise of business judgment." *Sheehan v. Dobin*, 2011 WL 1627051, at *3 (D.N.J. Apr. 28, 2011).

Moreover, section 363(k) authorizes secured creditors to purchase property through credit bids, "unless the court for cause orders otherwise." *See* 11 U.S.C. § 363(k) (stating that at a sale "of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property"); *Staiano v. Cain (In re Lan Assocs.. XI, L.P.)*, 192 F.3d 109, 112 n.1 (3d Cir. 1999). Section 363(m) protects a sale authorized under § 363(b) from later vacatur or modification on appeal.[10] Confirmation of proposed sales of assets of an estate lies within the discretion of the Bankruptcy Court. *In re Blue Coal Corp.*, 168 B.R. 553, 560 (Bankr. M.D. Pa. 1994).

---

[10] 11 U.S.C. § 363(m) provides that "[t]he reversal or modification on appeal of an authorization under section (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal."

The Third Circuit has stated that the

> core or non-core nature [of a proceeding] is crucial in bankruptcy cases because it defines both the extent of the Bankruptcy Court's jurisdiction, and the standard by which the District Court reviews its factual findings. To determine whether a proceeding is a 'core' proceeding, courts of this Circuit must consult two sources. First, a court must consult § 157(b). Although § 157(b) does not precisely define 'core' proceedings, it nonetheless provides an illustrative list of proceedings that may be considered 'core.' *See id.* § 157(b)(2)(A)-(O). Second, the court must apply this court's test for a 'core' proceeding. Under that test, 'a proceeding is core [1] if it invokes a substantive right provided by title 11 or [2] if it is a proceeding, that by its nature, could arise only in the context of a bankruptcy case.' This Court and other courts of appeals have relied on this test to ensure that § 157(b) 'core' proceeding jurisdiction is exercised in a manner consistent with *Marathon*.

*Halper v. Halper,* 164 F.3d 830, 836 (3d Cir. 1999) (citations omitted).

Both the Sale and Restitution Orders emanated from a core bankruptcy proceeding, which authorized the Bankruptcy Judge to '"hear and determine the issues and . . . enter appropriate judicial orders and judgments subject to traditional appellate review."' *In re Marcus Hook Dev. Park, Inc.,* 943 F.2d 261, 266 (3d Cir. 1991) (quoting B. Weintraub & A. Resnick, *Bankruptcy Law Manual* ¶ 6.04[2] (rev. ed. 1986)). Section 157(b)(2)(N) of Title 28 identifies core proceedings as "orders approving the sale of property other than property resulting from claims brought by the estate against persons who have not filed claims against the estate."[11] Courts have long held that a proceeding involving an order approving the sale of property is a core proceeding. *See, e.g., Jamaica Shipping Co.., Ltd. v. Orient Shipping Rotterdam, B.V. (In re Millennium Sea Carriers, Inc.)*, 458 F.3d 92, 95 (2d Cir. 2006) (holding that orders approving the sale of property are core proceedings pursuant to § 157(b)(2)(N)); *In re Marcus Hook Dev. Park, Inc.,* 943 F.2d at 267 (observing that "orders approving the sale of property" are core proceedings) (citing *In re Meyertech Corp*., 831 F.2d 410, 418 (3d Cir. 1987) (proceeding is core because it comports with

---

[11] The caveat to § 157(b)(2)(N) does not apply here.

14

one of the examples provided in section 157)); *HHI FormTech, LLC v. Magna Powertrain USA, Inc. (In re Formtech Indus., LLC)*, 439 B.R. 352, 357 (Bankr. D. Del. 2010) ("Orders granting the sale of assets, like the Sale Order issued by the Court in this case, are core proceedings.") (citing 28 U.S.C. § 157(b)(2)(N); *Trans World Airlines, Inc. v. Icahn (In re Trans World Airlines, Inc.)*, 278 B.R. 42, 49 n.16 (Bankr. D. Del. 2002) ("[C]ore proceedings under § 157(b)(2)(N) are those which arise from, concern, or have some impact on 'orders approving the sale of property'").

Further, LPP Mortgage sought entry of the Restitution Order because, by remaining on the property sold to LPP Mortgage in the Trustee's sale, the Debtors were not in compliance with the Sale Order, and LPP asked that the Sale Order be enforced. "Enforcement and interpretation of orders issued in core proceedings are also considered core proceedings within the bankruptcy court's jurisdiction." *In re Formtech Indus., LLC,* 439 B.R. at 357 (citing *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009) (holding that "the Bankruptcy Court plainly had jurisdiction to interpret and enforce its own prior orders.")). Thus, the Restitution Order was a core proceeding because "it required the court to interpret and give effect to its previous sale order[]." *Allegheny Univ. of the Health Sciences v. Nat'l Union of Hosp. & Health Care Employees (In re Allegheny Health, Educ. & Research Found.),* 383 F.3d 169, 176 (3d Cir. 2004); *see also Bayer Bus. & Tech. Servs. v. AGR Premier Consulting, Inc. (In re AGR Premier Consulting, Inc.)*, 550 F. App'x 115, 122 (3d Cir. 2014) ("'[A] Bankruptcy Court plainly ha[s] jurisdiction to interpret and enforce its own prior orders'" (quoting *Travelers*, 557 U.S. at 138); *In re Marcus Hook Dev. Park, Inc.,* 943 F.2d at 266, 267 (motion to enforce bankruptcy sale order is core proceeding, and citing 11 U.S.C. § 105(a) as permitting bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title," which gave the bankruptcy court "the power and the jurisdiction to enforce its valid orders.").

Moreover, the Bankruptcy Court's jurisdiction was augmented by its own explicit retention of jurisdiction to enforce orders related to the Trustee sale. Its October 8, 2010 Approval Order—which, *inter alia*, authorized procedures for the sale of the Debtors' assets—provided that the Bankruptcy Court retained jurisdiction "over any matter or dispute arising from or relating to the implementation of this Order or related to the Sale(s)." (09-bk-10003, Dkt. No. 53, ¶ 6).[12] *See Travelers*, 557 U.S. at 151 (noting that bankruptcy court authority to enforce its own prior orders was augmented by court's explicit retention of jurisdiction over matter); *accord In re AGR Premier Consulting, Inc.*, 550 F. App'x at 122.

Finally, there is no question that the Sale Order satisfies the Third Circuit's core proceeding test because it invoked the trustee's power to sell property of the estate under Section 363, a substantive provision of the Bankruptcy Code. Further, the Chapter 7 Trustee sale of assets of a bankruptcy estate could arise only in the context of a bankruptcy case. The Restitution Order, in turn, enforces the provisions of the Sale Order. In *Clark v. Chrysler Group, LLC*, 2010 WL 4486927 (E.D. Pa. Nov. 5, 2010), a district court held that while it was not entirely clear that an order interpreting a bankruptcy sale order fell squarely within § 157(b)(2)(N)'s definition of a core proceeding, it was a core proceeding "because its resolution turns on the interpretation of the Bankruptcy Court's Sale Order. . . and is based on the rights established by the Sale Order." *Id.* at *8. Similarly here, the Restitution Order is grounded in an interpretation of the Sale Order for purposes of enforcing that Order. Thus, the Court concludes that the Restitution Order also satisfies the Third Circuit's core proceeding test.

In view of the foregoing, the Court concludes that the Sale and Restitution Orders were

---

[12] The Order also provided that "[t]his matter is a core proceeding pursuant to 28 U.S.C. 157(b)(2)(A), (N) and (O)." (Dkt. No. 53 at 2).

core proceedings, and that the Bankruptcy Court had the requisite statutory authority to enter these Orders.

### b. Constitutional Authority

Having found that the Bankruptcy Court had the requisite statutory authority to issue the Sale and Restitution Orders, the question becomes whether that Court also had the constitutional authority to do so. The issue of a bankruptcy court's constitutional authority to enter a final order was discussed at length in *Stern*. The issue involves the interplay between Articles I and III of the U.S. Constitution. In Article I, Congress was granted the power to enact bankruptcy laws: "The Congress shall have Power . . . To establish. . . uniform Laws on the subject of Bankruptcies throughout the United States." U.S. Const., § 8, cl. 4. Judicial power, on the other hand, emanates from Article III, which mandates that "[t]he judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const. Art. III, § 1. Article III judicial power "'can no more be shared' with another branch 'than the Chief Executive, for example, can share with the Judiciary the veto power[.]'" *Stern*, 564 U.S. at 483 (quoting *United States v. Nixon*, 418 U.S. 683, 704 (1974)). In other words, the "Framers considered it essential that the judiciary remain truly distinct from both the legislative and executive." *Id.* (internal quotation marks omitted).

The question of a bankruptcy court's constitutional authority to issue a final decision on a claim depends on whether the claim involves a public right (where bankruptcy courts may issue final orders) or a private right (where they may not). The *Stern* Court surveyed public rights jurisprudence, and culled examples of claims that fell within that rubric, which would allow such claims to be "decided outside the Judicial Branch." *Id.* at 488. In its survey of the "varied formulations" over the years of the public rights exception, the *Stern* Court wrote that "what makes

a right 'public' rather than private is that the right is integrally related to particular federal government action"; it "derive[d] from a federal regulatory scheme"; it involved "a matter that can be pursued only by grace of the other branches" or could have historically "been determined exclusively by those branches"; "flow[ed] from a federal statutory scheme"; was "completely dependent upon adjudication of a claim created by federal law"; or "the asserted authority to decide [the] claim is . . . limited to a particularized area of the law." *Id.* at 490, 493. These varied formulations of "public rights" have been applied, depending on the context in which the issue was presented to the court.[13]

An order confirming sale of a bankruptcy estate's assets and a restitution order enforcing that sale are "pure bankruptcy matters" that stem from a bankruptcy court's core and traditional "bankruptcy powers," which include the restructuring of debtor-creditor relations. *N. Pipeline Const. Co. v. Marathon Pipe Line Co*., 458 U.S. 50, 71 (1982). Thus, the Sale Order and the Restitution Order here flowed directly from a federal statutory scheme. In that context, a bankruptcy estate was created which included the Debtors' property. As the case was a Chapter 7 liquidation proceeding, it involved liquidating the estate's assets—selling the Debtors' real property at auction in order to reduce the creditors' claims against the estate. *See Murphy v. Felice (In re Felice),* 480 B.R. 401, 433 (Bankr. D. Mass. 2012) ("[B]y voluntarily filing for bankruptcy relief, the Debtors willingly subjected themselves to a federal scheme for restructuring debtor-creditor relations created by Congress pursuant to its Article I power . . . A core feature of that

---

[13] Citing *N. Pipeline Constr. Co.*, 458 U.S. at 69, the Watsons argue that public rights are "controversies between the government and others," and since this case involves disputes between private parties, the public rights exception does not apply. (Dkt. No. 9 at 28). This is an incorrect statement of the law regarding the reach of "public rights." As the Court noted in *Stern*, "[s]hortly after *Northern Pipeline,* the Court rejected the limitation of the public rights exception to actions involving the Government as a party." *Stern*, 564 U.S. at 490.

scheme is the debtor's consent to the trustee's disposing of his property.").[14] This act is of basic importance in the administration of the bankruptcy estate. In contrast to the state law counterclaim asserted in *Stern*, no state law causes of action were raised before the Bankruptcy Court here. Accordingly, the Court concludes that the claim here involves administration of public rights, which is properly within the jurisdiction of the Bankruptcy Court. *See Prime Healthcare Servs., Inc. v. Hudson Hosp. Pro Pco, Inc., (In re Christ Hosp.)*, 2014 WL 4613316 (D.N.J. Sept. 12, 2014) (district court approvingly cited bankruptcy court's holding that its "jurisdiction to interpret and enforce its sale and confirmation orders is historic and unimpeded by *Stern v. Marshall* or other recent developments in the law," *id.* at *7, and thus refusing to extend *Stern*'s reach into bankruptcy court's authority to enforce its § 363 sales orders pursuant to § 157(b)(2)(N), *id.* at *9).

This conclusion is consistent with the recognition that *Stern*'s holding that "the authority granted by Congress to the bankruptcy courts exceeded the limitations of Article III" was made in "'one isolated respect'" and did not apply where the claims were "not independent of the bankruptcy but rather irreversibly intertwined with the Bankruptcy Court-approved resolution of [the party's] underlying claims against the bankruptcy estate[.]" *In re New Century TRS Holdings, Inc.*, 544 F. App'x at 73 (quoting *Stern*, 564 U.S. at 503); *see also In re Christ Hosp.*, 2014 WL 4613316, at *9 (emphasizing *Stern*'s "narrow" holding); *Ardi Ltd. P'ship v. The Buncher Co. (In re River Entm't Co.)*, 467 B.R. 808, 816-18 (Bankr. W.D. Pa. 2012) (finding that *Stern* did not preclude bankruptcy court's authority where the resolution of the matter was entirely dependent on court's interpretation and enforcement of court's prior order and not dependent on adjudication

---

[14] "Chapter 7 of the Bankruptcy Code is titled 'Liquidation,' and this title fully expresses the purpose of the Chapter's provisions. Chapter 7 provides the mechanism for taking control of the property of the debtor, selling it and distributing the proceeds in accordance with the distribution scheme of the Code. It is the basic recovery provided for by the Bankruptcy Code." 1-1 *Collier on Bankruptcy* ¶ 1.07 (16th ed.)

of an independent state law claim); *Moore v. Martillo (In re CD Liquidation Co., LLC)*, 462 B.R. 124, 136 (Bankr. D. Del. 2011) (finding *Stern* inapposite where injunction motion did not "raise any substantive or state law issues," but "involve[d] the most basic and intrinsic authority of this or any court—the authority to enforce its [Confirmation] order."). Thus, the narrow holding of *Stern* did not "meaningfully change[] the division of labor in the current [bankruptcy] statute," and does not apply here. *Stern*, 564 U.S. at 502.[15]

Accordingly, this Court concludes that the Sale and Restitution Orders herein involved the adjudication of public, not private, rights, and thus did not require an Article III judge for their resolution. The Bankruptcy Judge, therefore, had the requisite statutory and constitutional authority to enter the Orders at issue.

### c. Other Constitutional and Jurisdictional Issues

Having determined that the Bankruptcy Court's exercise of jurisdiction over the Sale and Restitution Orders was statutorily and constitutionally permissible—such that a non-Article III judge could enter those Orders—this conclusion impacts a number of the Watsons' related constitutional and jurisdictional arguments. For example, the Watsons claim a "right" to have an Article III judge, rather than an "Article III adjunct or a non-Article III judge hear bankruptcy cases," particularly following the *Stern* decision. (Dkt. No. 9 at 26). As discussed above, *Stern* provides no support for this proposition. Moreover, *Stern* rejected the characterization of Bankruptcy Judges as "Article III adjuncts," noting that, given their authority to issue final judgments in many instances, "a bankruptcy court can no more be deemed a mere 'adjunct' of the

---

[15] The Watsons claim that "*Stern* casts doubt on the constitutionality of the entire bankruptcy system which is narrowly propped upon the supervision of bankruptcy judges by Article III district courts." (Dkt. No. 9 at 36).  The Court rejects the Watsons' attempt to broaden *Stern* completely out of proportion to its actual holding.

district court than a district court can be deemed such an 'adjunct' of the court of appeals." *Stern*, 564 U.S. at 500. Other related constitutional and jurisdictional arguments advanced by the Watsons that rely on *Stern,* which the Court similarly rejects are: whether "there is a right to have either [sic] an Article III judge rather than an Article III adjunct hear bankruptcy cases," and whether "there is a right absent the availability of an Article III judge to hear bankruptcy cases to have such cases heard by a Judge appointed by the President and Confirmed by the Senate." (11-cv-0058, Dkt. No. 9 at 9).

In sum, the Court finds that the Bankruptcy Court had both statutory and constitutional authority to enter the Sale and Restitution Orders; that *Stern* does not apply under the circumstances here; and that the Watsons' many arguments that rely completely or in part on *Stern* in their challenge to the Bankruptcy Court's jurisdiction to enter the Orders are unavailing.

## B. Challenges to the Jurisdiction of the District Court of the Virgin Islands and its Bankruptcy Division to Hear This Case

The Watsons' next cluster of constitutional and jurisdictional challenges focus on the legitimacy of the Bankruptcy Court and the District Court of the Virgin Islands to hear and decide this case. In order to place their arguments in context, some background concerning the structure of the District Court of the Virgin Islands and its Bankruptcy Division is in order.

### 1. Statutory Background of the District Court and Its Bankruptcy Division

As an unincorporated territory of the United States, the federal court system in the Virgin Islands falls under Article IV of the Constitution. In contrast, then, to district courts in the fifty States, which are established pursuant to Article III of the United States Constitution, "[t]he District Court of the Virgin Islands derives its jurisdiction from congressional action based on Article IV." *United States v. Carino*, 596 F. App'x 88, 91 (3d Cir. 2014); U.S. Const., Art. IV, § 3 ("The Congress shall have Power to dispose of and make all needful Rules and Regulations

respecting the Territory or other Property belonging to the United States[.]"). In that regard, "Congress enacted the 'Revised Organic Act,' 48 U.S.C. § 1541 *et seq.*, for the Virgin Islands to provide a basis for territorial government and 48 U.S.C. § 1612 to define the scope of the District Court's jurisdiction." *Id.* In Section 1612, Congress directed that the District Court of the Virgin Islands "shall have the jurisdiction of a District Court of the United States, including, but not limited to, . . . that of a bankruptcy court of the United States." 48 U.S.C. § 1612(a); *see United States v. Gov't of the Virgin Islands*, 363 F.3d 276, 284 n.3 (3d Cir. 2004) ("The District Court of the Virgin Islands is an Article IV court, but is authorized by statute to exercise jurisdiction equivalent to an Article III court.") (citing 48 U.S.C. § 1612(a)). Section 1614 of the Revised Organic Act provides, in pertinent part, that "[t]he President shall, by and with the advice and consent of the Senate, appoint two judges for the District Court of the Virgin Islands, who shall hold office for terms of ten years and until their successors are chosen and qualified, unless sooner removed by the President for cause." 48 U.S.C. § 1614(a). Thus, as an Article IV Court with the same jurisdiction as an Article III Court, including jurisdiction over core bankruptcy matters, the Constitution authorizes and the federal Revised Organic Act confers jurisdiction on this Article IV Court to hear bankruptcy matters.

As noted above, 28 U.S.C. § 1334 confers upon district courts "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). Title 28, Section 157 provides that "[e]ach district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district." 28 U.S.C. § 157(a). Consistent with § 1612(a), district courts in the Virgin Islands may refer matters to bankruptcy judges in the District of the Virgin Islands. *See George v. Alvin Williams Trucking &*

22

*Equipment Rental, Inc.*, 2004 WL 169828, at *2 (D.V.I. Jan. 16, 2004) ("Congress also gave this Court the same authority [as Article III courts] to refer these [bankruptcy] actions to the bankruptcy judges for the district[.]"). Pursuant to this authority, on April 1, 1990, the District Court of the Virgin Islands issued a Standing Order which provides, in part, that all cases under Title 11, all proceedings arising under Title 11 or arising in or relating to a case under Title 11, "shall be referred to the bankruptcy judges for the district." D.V.I. April 1, 1990 Standing Order: Dkt. No. 10 at 26; *see also George*, 2004 WL 169828, at *2.

Other bankruptcy statutes are significant to the structure of the bankruptcy system, both nationwide and in the Virgin Islands. Pursuant to 28 U.S.C. § 155, "[a] bankruptcy judge may be transferred to serve temporarily as a bankruptcy judge in any judicial district other than the judicial district for which such bankruptcy judge was appointed upon the approval of the judicial council of each of the circuits involved." *Id.* § 155(a). Separately, 28 U.S.C. § 332 authorizes the judicial council of each circuit to "make all necessary and appropriate orders for the effective and expeditious administration of justice within its circuit." 28 U.S.C. § 332(d)(1).

Consistent with these authorities, the Chief Judge of the Third Circuit issues "Designation[s] of a Bankruptcy Judge for Service in Another District within the Circuit," renewable annually, which temporarily assign a bankruptcy judge to sit in the Virgin Islands. The appellate record contains a copy of the Designation issued by Chief Judge Theodore A. McKee to the Honorable Mary F. Walrath, the designated Bankruptcy Judge for the Virgin Islands, dated December 13, 2010 and covering calendar year 2011. In that Designation, Chief Judge McKee found that "the public interest so requires" that he designate and assign Judge Walrath, of the United States Bankruptcy Court for the District of Delaware, to hold court in the District of the Virgin Islands during 2011. (Dkt. No. 10 at 27).

Finally, 28 U.S.C. § 158 grants jurisdiction to the district courts to hear appeals from final judgments, orders, and decrees of "bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title." 28 U.S.C. § 158(a). The statute further provides that an appeal under that subsection "shall be taken only to the district court for the judicial district in which the bankruptcy judge is serving." Pursuant to this authority, the District Court of the Virgin Islands hears appeals from its Bankruptcy Division.

### 2.  Whether Bankruptcy Judges Can Serve in the Virgin Islands

The Watsons contend that "[a] Bankruptcy Judge may not sit by designation of the Third Circuit in the Virgin Islands since there is no Article III District Court" (Dkt. No. 9 at 33) and thus the Bankruptcy Court "did not have jurisdiction" over this matter. *Id*. at 18. They "take issue" with the Third Circuit's holding in *Vickers Assocs., Ltd. v. Urice (In re Jaritz Indus.)*, 151 F.3d 93 (3d Cir. 1998), claiming that it was "incorrectly decided" and represents dicta; that a Ninth Circuit case, *In re Webster*, 363 F.2d 837 (9th Cir. 1966), should be followed instead; and that *Rea v. Federated Investors,* 627 F.3d 937 (3d Cir. 2010) "implicitly overruled *Jaritz*"; and that 28 U.S.C. § 152(a)(4) forecloses the temporary assignment of bankruptcy judges in the Virgin Islands. (Brief at 18-20, 33-34).

*In re Jaritz* rejected the contention, which the Watsons echo here, that "any bankruptcy judge transferred to the Virgin Islands by the Circuit Council lacks authority to adjudicate any bankruptcy matters there" because it is an Article IV, rather than an Article III court. *In re Jaritz*, 151 F.3d at 97. In *In re Jaritz,* the Third Circuit Judicial Council temporarily assigned a retired bankruptcy judge from the Western District of Pennsylvania to the Virgin Islands to meet the need there for the services of a bankruptcy judge. The *In re Jaritz* case was referred to that judge pursuant to the District Court's Standing Order of Reference. The Bankruptcy Judge entered a

sanctions order against a creditor and his attorney, who appealed that order to the District Court. Because the District Court on appeal read the term "judicial district" in 28 U.S.C. § 155's provision that "[a] bankruptcy judge may be transferred to serve temporarily as a bankruptcy judge in any *judicial district*," as authorizing temporary transfer of bankruptcy judges only to Article III district courts, the Court ruled that the bankruptcy judge lacked authority to sit in the Article IV District Court of the Virgin Islands. Accordingly, the Court concluded that there was no "valid order to review," and dismissed the appeal. *Id.* at 96. The District Court then withdrew its Standing Order of Reference. The debtor, Jaritz Industries, appealed to the Third Circuit.

In opining on the statutory and jurisdictional underpinnings of bankruptcy jurisdiction in the Virgin Islands, the Third Circuit in *In re Jaritz* engaged in statutory interpretation and found two bases upon which the transfer of the bankruptcy judge to the Virgin Islands was proper: under § 155 and, alternatively, under § 332.[16] With regard to Section 155, the Court found nothing in the text of the statute, its legislative history, or the overall statutory scheme that was meant to limit the ability to transfer a bankruptcy judge to serve only in judicial districts with Article III judges as opposed to the Virgin Islands, where federal judges are appointed under Article IV of the Constitution. This was particularly so where the "territorial courts created by Congress under Article IV. . . , like the District Court of the Virgin Islands, were authorized to exercise the subject matter jurisdiction of Article III district courts," including adjudication of bankruptcy cases. *Id.* at 98.[17] With regard to Section 332, which governs the authority of judicial councils to act so as to

---

[16] Two of the three Judges on the panel found that 28 U.S.C. § 155 authorized transfer of bankruptcy judges to the Virgin Islands; all three of the Judges found that 28 U.S.C. § 332(d) authorized the transfer.

[17] Two of the panel members held that, notwithstanding a statutory definition of "judicial district" in § 451 of Title 28 encompassing only Article III district courts, Congress intended the term as used in § 155 to be broader and to include Article IV district courts; therefore, the Third Circuit

promote the "effective and expeditious administration of justice within its circuit," the Third Circuit found that the transfers of bankruptcy judges to the Virgin Islands to assist in servicing the bankruptcy load there was authorized by the statute to encompass the action taken by the Circuit Council in that case. *Id.* at 98, 101.[18]

Thus, the Third Circuit in *In re Jaritz* concluded that the temporary assignment of bankruptcy judges to the Virgin Islands was authorized under two statutes; that the fact that the District Court of the Virgin Islands is an Article IV rather than an Article III court did not make a difference in authorizing the temporary transfer; and that the Bankruptcy Court had jurisdiction to enter orders.[19] This binding authority resolves the constellation of issues raised by the Watsons.

The Watsons' various arguments against the applicability of *In re Jaritz* do not pass muster. First, they argue that since *In re Jaritz* dealt only with the validity of sanctions and not a substantive order, "it can be argued that it was dicta rather than a holding as to substantive orders." (Dkt. No. 9 at 18-19). While the Court understands the basis for the Watsons' argument, it finds that the text of *In re Jaritz* dispenses with this contention. In this regard, the Court wrote:

> *Under normal circumstances*, we would conclude our analysis here [affirming the Bankruptcy Court's sanctions order]. The foregoing discussion therefore provides adequate support for our mandate. *Nonetheless*, the district court's opinion expresses the view that any bankruptcy judge transferred to the Virgin Islands by the Circuit Council lacks authority to adjudicate any bankruptcy matters there, and

___

[footnote continued] was authorized under § 155 to temporarily transfer a bankruptcy judge originally appointed to the Western District of Pennsylvania to serve in the District of the Virgin Islands. *In re Jaritz*, 151 F.3d at 99-100.

[18] The Third Circuit noted that the District Court's order that was appealed and the resulting withdrawal of the Standing Order of Reference had "substantially burdened the administration of bankruptcy in the Virgin Islands." *In re Jaritz*, 151 F.3d at 97.

[19] In *Alkon v. United States*, 239 F.3d 565 (3d Cir. 2001), the Third Circuit fully adopted the statutory analysis in *In re Jaritz* when analyzing the meaning of the term "district court" in § 155, and applied that definition to another statute concerning the District Court of the Virgin Islands.

this view has resulted in the withdrawal of the district's standing order of reference. This has *substantially burdened* the administration of bankruptcy in the Virgin Islands. *Because the issue is of such significance and the parties have briefed it extensively, we pursue our discussion of whether [the bankruptcy judge assigned to the Virgin Islands] was properly authorized to hear bankruptcy matters in the Virgin Islands.*

*In re Jaritz*, 151 F.3d at 97 (emphasis added). The Court then wrote, "[t]he specific issue for decision here is a narrow one: what did Congress intend when it used the term 'judicial district' in § 155." *Id.*

Thus, the Third Circuit recognized that "under normal circumstances," an exposition on the statutory interpretation of 28 U.S.C. § 155 would be dicta because it had already found that the district court had jurisdiction to review the sanctions order before it based on a court's interest in conducting proceedings in an orderly manner. The affirmance of the sanctions order did not implicate any of the other jurisdictional arguments raised concerning the transfer of bankruptcy judges to the Virgin Islands and the adjudication of bankruptcy matters there. But, as the Third Circuit in *In re Jaritz* made clear, this was not a "normal circumstance." The Court was impelled to address and decide the issues surrounding general bankruptcy jurisdiction in the Virgin Islands, given that the district court's order finding that a bankruptcy court judge lacked authority to sit in the District Court of the Virgin Islands and the resulting withdrawal of the Standing Order of Reference, "substantially burdened" the administration of bankruptcy in the Territory. Because the impact of the district court's order went to the very core of bankruptcy jurisdiction in the Virgin Islands, and was an issue of "such significance" (which had been fully briefed), the Third Circuit proceeded to discuss and decide the issue of whether § 155 authorized transfers of bankruptcy judges to serve in the District of the Virgin Islands. It answered that question in the affirmative, as a holding of the Court. Accordingly, the Court rejects the Watsons' view that the holding in *In re Jaritz* should be considered to be mere dicta.

27

Further, contrary to the Watsons' contention, the Third Circuit in *Rea* did not "implicitly overrule[] *Jaritz*." (Dkt. No. 9 at 19). The Court in *Rea* analyzed the text of the Bankruptcy Code's antidiscrimination provision and held that the statute did not create a cause of action against private employers who engaged in discriminatory hiring—*i.e.* refusing to hire because the applicant had declared bankruptcy. *Rea*, 627 F.3d at 941. The Watsons apparently cite *Rea* because the Third Circuit gave a narrow reading to a statutory phrase used in the antidiscrimination statute, in contrast to the liberal reading it gave to the phrase "district court" in § 155. This analysis in *Rea*— interpreting different terms in a different bankruptcy provision—is inapposite. It does not in any way overrule *In re Jaritz*, implicitly or otherwise. Nor could it because, pursuant to the Internal Operating Rules of the Third Circuit, a Third Circuit panel cannot overrule an earlier binding panel decision; only the entire court sitting *en banc* can do so. *Chester ex rel. N.L.R.B. v. Grane Healthcare Co.*, 666 F.3d 87, 94 (3d Cir. 2011) (citing Third Circuit I.O.P. 9.1).

The Watsons' reliance on *In re Webster* suffers the same fate. *Webster* concerned a disciplinary proceeding in 1965 involving an attorney from Guam. The Ninth Circuit held that the attorney was entitled to have his disciplinary charge adjudicated and heard by the district judge— not by the district judge together with two other members of Guam's Island Court who assisted the district judge on the bench. The Ninth Circuit ruled that only the district judge could adjudicate the issues; that no applicable statute, regulation or rule of court authorized the procedure used in that case; and that the assistance of persons not connected with the district judge's staff was unauthorized. *Webster*, 363 F.2d at 839.

*Webster* did not reach a "different result" than *In re Jaritz*, as the facts and legal issues in

the cases were completely different.[20] Moreover, a Ninth Circuit case decided thirty-plus years before *In re Jaritz* should not be considered persuasive in the face of binding authority in the Third Circuit. *See United States v. Mitlo*, 714 F.2d 294, 298 (3d Cir. 1983) ("[A] decision by this court, not overruled by the Supreme Court[,] is a decision of the court of last resort of this federal judicial circuit and is therefore 'binding on all inferior courts and litigants in the Third Judicial Circuit.'") (quoting *Allegheny Gen. Hosp. v. NLRB*, 608 F.2d 965, 970 (3d Cir. 1979)).

Finally, the Court rejects the Watsons' argument that 28 U.S.C. § 152(a)(4) precludes the temporary transfer of bankruptcy judges to the Virgin Islands. (Dkt. No. 9 at 25). Here, too, *In re Jaritz* forecloses that argument.

Section 152(a)(4) provides:

> The judges of the district courts for the territories shall serve as the bankruptcy judges for such courts. The United States court of appeals for the circuit within which such a territorial district court is located may appoint bankruptcy judges under this chapter for such district if authorized to do so by the Congress of the United States under this section.

28 U.S.C. § 28(a)(4). The Watsons contend that the Third Circuit cannot appoint bankruptcy judges to serve in the territories under this statute in the absence of Congressional authorization—

---

[20] Within the context of their discussion of *Webster*, the Watsons observed that 48 U.S.C. § 1614(a) of the Revised Organic Act, enumerates different categories of judges that the Chief Judge of the Third Judicial Council is authorized to assign to the District Court of the Virgin Islands to "serve temporarily as a judge of the District Court of the Virgin Islands," including a judge of a court of record of the Virgin Islands, a circuit or district judge in the Third Circuit, or a recalled senior judge of the District Court. *Id.* Because Bankruptcy Judges are not listed in § 1614(a), the Watsons claim that they cannot be assigned to serve in the Virgin Islands. The Watsons are mixing apples and oranges. By its explicit terms, § 1614(a) addresses those judges who may be assigned to serve "temporarily as a judge of the District Court of the Virgin Islands." In other words, the provision identifies judges who are permitted to substitute for the *district court judge*. The fact that bankruptcy judges are not afforded that particular privilege is completely irrelevant to the question of whether bankruptcy judges can be assigned temporarily to serve as *bankruptcy* judges in the Virgin Islands. As the Third Circuit in *In re Jaritz* holds, the authority to temporarily assign bankruptcy judges in the Virgin Islands arises from both 28 U.S.C. § 155(a) and 28 U.S.C. § 332(d). *In re Jaritz*, 151 F.3d at 97-103.

which does not exist. (Dkt. No. 9 at 25). However, this argument conflates the requirement that Congress authorize full-time bankruptcy judges for the territories, as set forth in § 152, with the separate authority under other statutes, *i.e.* 28 U.S.C. §§ 155 and 157, that permits the circuit to designate *temporary* bankruptcy judges to serve in those districts, prior to the time that the bankruptcy workload is deemed to be sufficiently heavy to warrant a request to Congress and approval from that body to appoint a full-time bankruptcy judge. In *In re Jaritz,* the Third Circuit explained this precise point. *In re Jaritz*, 151 F.3d at 98-99. Thus, the Court finds that the Watsons' argument is without merit.

In view of the foregoing, the Court rejects the Watsons' arguments that a Bankruptcy Judge may not sit by designation of the Third Circuit in the Virgin Islands since there is no Article III District Court, and that orders issued by such a Bankruptcy Judge are, as a result, "void or voidable due to lack of legal authority" to sit in the Territory. To the contrary, Article IV confers on Congress the authority to determine the jurisdiction of the District Court of the Virgin Islands, and the Revised Organic Act, passed by Congress, confers jurisdiction over bankruptcy matters to the District Court. Further, the Third Circuit, as held in *In re Jaritz*, has the authority under two statutes, 28 U.S.C. §§ 157 and 332, to temporarily transfer bankruptcy judges from another judicial district in the Third Circuit to the Virgin Islands, and the Third Circuit properly exercised that authority to temporarily transfer a bankruptcy judge to the Virgin Islands—who in turn heard the Watsons' case. Accordingly, the Bankruptcy Judge, the Honorable Mary F. Walrath, sitting by designation in the Bankruptcy Division of the District Court of the Virgin Islands had the requisite legal authority to sit in the Article IV District Court of the Virgin Islands; had jurisdiction over the Watsons' case; and had the authority to issue the Orders here.

### 3. Related Arguments

#### a. Appeal Heard by Article III Judge

The Watsons also assert that they have a right to have this appeal heard *de novo* by an Article III judge, a right which includes a "bankruptcy appeal by trial," at least in a circumstance where "the original judge was not an Article III judge." (Dkt. No. 9 at 37).[21] They suggest that the "simplest way to accomplish this," as a means of curing some of the alleged legal and constitutional infirmities of the current arrangement for bankruptcy cases in the Virgin Islands, would be "to transfer the case to the United States District Court for the District of Delaware since it has supervisory authority over the Bankruptcy Judge in this case." *Id.* The Watsons claim that appeals may be transferred pursuant to 28 U.S.C. § 1631 to cure jurisdictional infirmities, and that such transfer is "mandatory if the interests of justice so require," which they assert is the case here. *Id.* at 37-38.

This argument is foreclosed by 28 U.S.C. § 158(a), as discussed in the Third Circuit's Opinion in *Coffey v. Marina Mgmt. Servs. Inc. (In re Kool, Mann, Coffee & Co.)*, 23 F.3d 66 (3d Cir. 1994). In *In re Kool, Mann*, the Third Circuit found that a Local Bankruptcy Rule of the Bankruptcy Division of the District Court of the Virgin Islands—providing that appeals from the Bankruptcy Division were to be forwarded directly to the Third Circuit Court of Appeals— conflicted with 28 U.S.C. § 158, which provides that appeals from decisions by bankruptcy judges must be directed to the district court for the district where the bankruptcy judge is serving.[22] In this

---

[21] The Watsons' argument that they have a right to a "bankruptcy appeal *by trial de novo* by an Article III court" is predicated on the alleged "legal and constitutional infirmities of the current arrangement for bankruptcy cases in the Virgin Islands[.]" (Dkt. No. 9 at 37). The faulty premise of this argument, as discussed above, renders the argument fatally flawed.

[22] 28 U.S.C. § 158 provides, in pertinent part, that "[t]he district courts of the United States shall have jurisdiction to hear appeals from final judgments, orders, and decrees, . . . and with leave of

regard, the Court held that, pursuant to § 158, appeals from decisions rendered by bankruptcy judges sitting by designation in the Virgin Islands must be heard by the District Court of the Virgin Islands. *Id.* at 68; *see id.* at 69. In other words, pursuant to 28 U.S.C. § 158(a), the District Court of the Virgin Islands has the same appellate jurisdiction over decisions of a bankruptcy judge as possessed by Article III district courts. *See also* 48 U.S.C. § 1612(a) (vesting district judges of the Virgin Islands with the jurisdiction of "a bankruptcy court of the United States").

Accordingly, the provisions of § 158(a) apply in the Virgin Islands, and appeals from the Bankruptcy Division are properly directed to the District Court of the Virgin Islands, notwithstanding its status as an Article IV Court. The Watsons' contentions that the appeals herein must be transferred to the District Court of Delaware and that they have a right to have the appeals heard by an Article III judge are, therefore, groundless.

The Watsons' citation to 28 U.S.C. § 1631 is equally unavailing. That statute permits the transfer of an appeal—if the court finds that there is a "want of jurisdiction"—to a court in which the appeal could have been brought at the time it was filed. However, here there was no "want of jurisdiction" either in the bankruptcy court or district court, and therefore no reason to invoke § 1631.

The Watsons also assert that, in the wake of *Stern*, which "cast doubt on the constitutionality of the entire bankruptcy system," if a judge has no authority under the bankruptcy statutes or Constitution to sit in the Virgin Islands, all orders issued by the Bankruptcy Court in the Virgin Islands are void or voidable for lack of subject matter jurisdiction. (Dkt. No. 9 at 36).

---

the court, from interlocutory orders and decrees, of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title. An appeal under this subsection shall be taken *only* to the district court for the judicial district in which the bankruptcy judge is serving." 28 U.S.C. § 158(a) (emphasis added).

As indicated above, *Stern* made no such all-encompassing pronouncement; the Bankruptcy Court has statutory and constitutional authority to sit in the Virgin Islands; and the orders issued by the Bankruptcy Judge are not void or voidable for lack of subject matter jurisdiction.[23]

For all of the foregoing reasons, the Court rejects the Watsons' constitutional and jurisdictional arguments that challenge the authority of the District Court of the Virgin Islands and its Bankruptcy Division to hear this case, including: whether "there even exists a Bankruptcy Court in the Virgin Islands since there is no Article III Court"; whether "there is a right absent the availability of an Article III judge to hear bankruptcy cases to have such cases heard by a Judge appointed by the President and Confirmed by the Senate"; and whether "a judge may sit in the District Court (including any Bankruptcy Court) of the Virgin Islands without having been appointed by the President and confirmed by the Senate." (11-cv-0058, Dkt. No. 9 at 9).

### C. Merits-Based Arguments

Having dispensed with the overlapping constitutional and jurisdictional arguments spread through the Watsons' briefs, the Court will now address the specific merits-based arguments they have raised that challenge the Approval, Sale, and Restitution Orders.

### 1. The Approval and Sale Orders

The Watsons argue that the Bankruptcy Court should not have approved or confirmed the sale of the Property to LPP Mortgage because: (1) the Bankruptcy Court should have required a

---

[23] The Watsons also make a separation of powers argument to the effect that bankruptcy judges, as Article III adjuncts, may not sit in a non-Article III district court, such as the District Court of the Virgin Islands, because a bankruptcy judge is appointed by the Court of Appeals, which is part of the judicial branch, and they cannot serve under a non-Article III District Court, "which can be said to be part of the executive or legislative branch of government." (Dkt. No. 9 at 35). The Court, however, need not reach any separation of powers issues because, as discussed above, the Bankruptcy Court adjudicated a core proceeding that falls into the public rights exception, and such claims are properly adjudicated by non-Article III judges.

foreclosure sale and lifting of the automatic stay, which would have given the Watsons the right to redeem their property under Virgin Islands law, but the Court did not order this relief allegedly due to LPP Mortgage's bad faith and the collusion between LPP Mortgage and the Chapter 7 Trustee; (2) the Bankruptcy Court should have allowed the Watsons more time to obtain financing; and (3) the Bankruptcy Court erroneously allowed credit bidding and erroneously approved sales prices that were disproportionate to the values and amounts owed. (11-cv-0012, Dkt. No. 31 at 33-38). Because these arguments were either not raised before the Bankruptcy Court and are thus waived, or are meritless, they will be rejected.

### a. Procedural Background

On September 15, 2010, the Chapter 7 Trustee filed a proposed order which contained procedures for sale of the Debtors' assets and the form of the notices for the sale. (09-bk-10003, Dkt. No. 41). Among the terms contained in the proposed Order were that: the Trustee demonstrated good, sufficient and sound business purpose and justification for the sale pursuant to 11 U.S.C. § 363(b); if the sale was done in accordance with the sales procedures, then the consideration provided by a purchaser for any assets would be fair and reasonable and would be the highest and best offer for those assets; and that a secured creditor could submit a credit bid to the extent of its allowed claim. *Id.*

Ms. Gail Chiang[24] filed an Objection to the Sale on September 17, 2010, in which she stated that the loan she secured through U.S. Department of Agriculture-Rural Development was "expected to close" within sixty days, and asked the Bankruptcy Court to delay issuing the order

---

[24] Ms. Chiang was not a debtor in either of the bankruptcy cases. She is apparently a daughter of Curneall and Leona Watson, and was President of Caledonia Springs. At some of the Bankruptcy Court hearings, she was represented by counsel as an "interested party" who was attempting to obtain funding to purchase the properties. She also filed documents in the Bankruptcy Court which were considered and addressed by the Court.

approving the Trustee sale for an undetermined time "until she can offer her proposal to the trustee and the court." (09-bk-10002, Dkt. No. 68).[25]

The Court held a hearing on October 7, 2010 concerning the proposed Order. (09-bk-10003, Dkt. No. 52; 09-bk-10002, Transcript, Dkt. No. 105). At the October 7th hearing, the Chapter 7 Trustee stated that he had been giving Ms. Gail Chiang, an "interested party," and her attorney an opportunity to present a proposal to purchase the properties but, absent a proposal, his suggestion was to conduct the auction during the first week of December. (Dkt. No. 105 at 3). LPP Mortgage's counsel noted that the Trustee would provide the Debtors and Ms. Chiang an opportunity to make a definitive offer before the sale, which might obviate the need for an auction. He nevertheless urged the Court to enter the proposed Order submitted by the Trustee to allow the matter to proceed, rather than delay the sale. *Id.* at 5-6. Counsel observed that: LPP Mortgage filed a foreclosure action in 2002; was granted summary judgment in 2007; none of the loans had been paid in over fifteen years; and the Debtors had ample time to resolve their financial problems. *Id.* at 6-7.

The Court scheduled the auction for December 2, 2010; ordered written objections to the sale to be filed by December 7; and set a hearing for confirmation of the sale on December 9. *Id.* at 3, 9.

The Court also considered Ms. Chiang's objection at the hearing. Ms. Chiang's counsel indicated that she was endeavoring to secure financing to purchase the property, but did not ask that the December 2 sale date be rescheduled. (*See* 09-bk-10002, Dkt. No. 105 at 4: "I don't see a

_____

[25] The August 2010 letter from USDA that she attached to demonstrate that the loan had allegedly been secured was addressed to a bank in Rhode Island which indicated that Ms. Chiang was seeking "financing for a new business venture in the Virgin Islands" from the USDA's Business & Industry Loan Guarantee Program, but that the application for funding had not yet been submitted. (Dkt. No. 72).

problem with the time frame that the Court has set."). Counsel stated that he had asked a representative of the Office of the Congressional Delegate to attend the hearing to show Ms. Chiang's good faith effort in obtaining funding to purchase the property. *Id.* at 7-8.[26] Judge Walrath stated that she would not preclude anyone from submitting an offer, but "it will be subject to others making offers as well, and it will be done pursuant to a public auction." *Id.* at 7.

On October 8, 2010, the Bankruptcy Court entered the Approval Order "(I) Authorizing Procedures for Sales of the Debtors' Assets; and (II) Approving Form of Notice of Sales of Assets Pursuant to 11 U.S.C. 105 and 33, Fed. Bankr. P. 6004 and LBR 6004-1." (09-bk-10002, Dkt. No. 78). The Watsons did not object to the proposed Order or the October 8, 2010 Approval Order, nor did they obtain a stay of the sale.

At the eleventh hour, on November 30, 2010, Ms. Chiang filed a Motion for an Emergency Stay of the Sale seeking, *inter alia*, an additional ninety days to secure a loan from the U.S. Department of Agriculture to purchase the property. (09-bk-10003, Dkt. No. 58). In her emergency motion, she stated that a Rhode Island bank had agreed to approve a loan for her through USDA, and cited an attached letter from the then-Virgin Islands Congressional Delegate, Donna Christensen, in support of her request for a stay.[27] The Bankruptcy Court summarily denied the Motion on December 1, 2010. (09-bk-10003, Dkt. No. 61).

The sale was held on December 2, 2010 and the Trustee filed a report of sale on December 6, 2010. (09-bk-10002, Dkt. No. 82). No written objections to the sale were filed by the December 7, 2010 deadline, as required by the October 8, 2010 Approval Order.

---

[26] That person appeared by telephone but did not otherwise participate.

[27] The letter spoke in general terms, urging a stay "so that unresolved issues can be fully addressed before the auction proceeds and dispossesses the family of their business and realty assets." (Dkt. No. 58-2).

On December 9, 2010, the Court held a hearing on the Trustee's motion to approve the sale. Ms. Chiang submitted a written objection approximately one hour before the hearing. (09-bk-10003, Dkt. No. 65). The only issue raised relevant to this appeal is that she urged that the sale not be confirmed because it did not provide any option to pay the unsecured creditors. *Id.*

At the hearing, the Trustee reported that secured creditor LPP Mortgage was the only bidder at the auction. (09-bk-10003, Dkt. No. 71; 09-bk-10002, Transcript, Dkt. No. 106). The Debtors' attorney stated that, at the auction, the Debtors had observed that the bank put in a credit bid for the properties, which made them wonder "what would be the position in the best interest of the unsecureds? So on behalf of the debtors we ask for a review of the sale to ensure that everything was above board and as required by law." (Dkt. No. 106 at 3-4; *see also id.* at 11, 12). Debtors' counsel also stated that there was "only one person who could, in good faith, bid, and that was LPP Mortgage," *id.* at 11, and added that LPP Mortgage "could have requested a lift of the stay and . . . had the properties sold separately," which would have provided the Debtors with an "opportunity to redeem." *Id.* at 11-12.

LPP Mortgage's counsel responded that he had not received any written objection to the sale from the Debtors, and no such objections had been filed by the December 7 deadline pursuant to the Court's Order. *Id.* at 5. He stated that he had not heard any "substantive objection to the procedures of the auction itself" from the Debtors or "any suggestion that there was anything irregular about the way the auction was conducted." *Id.* at 6. Counsel noted that the Debtors appeared to be concerned that the total proceeds were insufficient to pay anything more than the two secured creditors—where the first priority secured lender, the Department of Agriculture, would be paid in full and LPP Mortgage would be paid 66%—but no one had suggested that the over 1.2 million dollars paid was "grossly inadequate" for the distressed assets being sold. *Id.* at

37

6, 7; *see id.* at 9, 10. Counsel also stated that if the Watsons had been concerned about the inadequacy of the sale amounts to pay their creditors, they had had ample time to liquidate their holdings and pay them. *Id.* at 10. He also questioned whether Ms. Chiang, who was neither a debtor nor an unsecured creditor, had standing to object to confirmation of the sale. *Id.*[28]

The Bankruptcy Court overruled the objections, agreeing that "there's been no suggestion or evidence that the procedures that I set were not followed," and that LPP Mortgage had the right to credit bid. *Id.* at 13-14 The Court further observed that "there was nobody else willing to submit any bid, let alone a bid that was higher on any of these properties. It's unfortunate that there was not a sufficient bid to result in payment to the unsecured creditors, or the Debtors, but in bankruptcy, unfortunately, that often happens." *Id.* at 14. The Court confirmed the sales. *Id.*

### b. Foreclosure Sale; Collusion

The Debtors never objected to the October 2010 Approval Order setting forth the procedures to be followed at the sale. They also interposed no written objections to the sale by the Court-ordered December 7, 2010 deadline. Even at the December 9, 2010 hearing, the Debtors never suggested that the sale had not followed all of the required procedures or that there was anything improper in how the sale was conducted.

Rather, the Debtors asked only that the Court review the procedures to ensure that everything was "above board and as required by law." (Dkt. No. 106 at 4). Debtors' counsel also commented at the December 9th hearing that *LPP Mortgage* could have decided to lift the stay and have the properties sold in accordance with local law, which would have afforded them additional time provided by the redemption period. However, the record does not show any

---

[28] While Ms. Chiang attended the hearing, her counsel did not, and she did not participate. (Dkt. No. 106 at 10-11).

requests to the Court by the Debtors to lift the stay. Moreover, Debtor's counsel acknowledged at the hearing that LPP Mortgage bid in good faith. The Court reviewed the procedures, found nothing improper, overruled the objections, such as they were, and confirmed the sale.

It is only on appeal that the Watsons, for the first time, assert that the "Court should have required a foreclosure and lifting of the automatic stay." (11-cv-0012, Dkt. No. 31 at 34).[29] It is also only on appeal that the Watsons, for the first time, claim "collusion" between the Chapter 7 Trustee and LPP Mortgage, and that LPP Mortgage engaged in "bad faith by pushing the auction in order to deprive Appellants of their redemption rights." *Id.* Because the Watsons have raised these arguments for the first time on appeal, there is no record for the Court to review, and the Court thus finds that the arguments have been waived. *Int'l Fin. Corp. v. Kaiser Group Int'l (In re Kaiser Group Int'l, Inc.)*, 399 F.3d 558, 565 (3d Cir. 2005) (holding that "when a party fails to raise an issue in the bankruptcy court, the issue is waived and may not be considered by the district court on appeal") (citing *Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm LP IV*, 229 F.3d 245, 253 (3d Cir. 2000))[30]; *see also Hatchigian v. State Farm Ins. Co.,* 574 F. App'x 103, 104 (3d Cir. 2014) (stating that argument not raised before court below and raised for first time on appeal is waived) (citing *B.S. v. Somerset Cnty.,* 704 F.3d 250, 267 n.28 (3d Cir. 2013));

---

[29] The record shows that once the District Court entered judgment against the Debtors in the underlying debt and foreclosure action and scheduled a Marshal's Sale of the property—which would have provided a redemption period once the sale occurred—the Watsons immediately filed for bankruptcy protection. They thus opted to forego foreclosure by taking advantage of the automatic stay provided in bankruptcy. The Watsons' current argument that the Bankruptcy Court should have required that the property be sold via foreclosure proceedings rather than via Trustee sale, notwithstanding that *they* chose the bankruptcy forum to deal with their assets (including their property) and debts, rings particularly hollow.

[30] *In re Kaiser* did not find waiver appropriate in that case because the defense of lack of subject matter jurisdiction is not waivable. *In re Kaiser*, 399 F.3d at 565. That defense is not applicable here.

*In re Natale*, 280 F. App'x 227, 229 (3d Cir. 2008) ("A finding of waiver is appropriate particularly where 'the evidence in the record is insufficient to permit a court to realistically' decide the issue.'") (quoting *Buncher Co.,* 229 F.3d at 253)). Accordingly, those arguments will not be addressed further by the Court.

### c. Time to Obtain Financing

The Watsons next challenge the Sale Order by claiming that the Bankruptcy Court "abused its discretion by not giving appropriate deference to the efforts of Congressional Delegate Christiansen to help arrange the financing." (11-cv-0012, Dkt. No. 31 at 35). They also claim that "[p]ayment to unsecured creditors could have occurred if the Bankruptcy Court had allowed Appellants to put together an offer." *Id.* They conclude that, considering the loss of the equity of redemption, the Bankruptcy Court abused its discretion in approving and confirming the sale because it "wiped out any possibility of either unsecured creditors getting more money or Appellants being able to redeem. This could have been mitigated at least in part by allowing more time to put together the financing." *Id.*

LPP Mortgage responds that the Watsons had "nearly nine years from the commencement of the District Court foreclosure action within which to make whatever arrangements they wished to meet their financial obligations to LPP"; that they gained "nearly two years merely by filing for bankruptcy protection"; and that they could not credibly argue that Judge Walrath abused her discretion in making the determination to proceed to public sale of the estate assets by the Trustee. (11-cv-0012, Dkt. No. 33 at 18).

Although the Debtors never asked the Bankruptcy Court to postpone the sale so that they could have more time to obtain financing, Ms. Chiang did so. Even considering Ms. Chiang's request, the Court finds that no abuse of discretion occurred in the Bankruptcy Judge's decision

not to postpone the sale. "An abuse of discretion exists where the [Bankruptcy C]ourt's decision rests on a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *In re Marvel Entm't Group, Inc.*, 140 F.3d 463, 470 (3d Cir. 1998) (internal quotation marks omitted). None of these errors occurred here.

As LPP Mortgage noted, the Debtors had ample time to liquidate their holdings or otherwise secure financing prior to the auction being scheduled—both during the foreclosure case, which began in 2002 (*see supra,* p. 2), and during the bankruptcy cases which began in 2009. From the documents submitted to the Bankruptcy Court, the purported loan that Ms. Chiang was seeking did not appear close to being consummated.[31] The Bankruptcy Court made it clear that the sale date was firm, and that the Debtors and Ms. Chiang were free to make any proposals they wished to make prior to or in the context of the auction. Ms. Chiang's counsel indicated at the October 2010 hearing that there was no objection to the December auction date. The Debtors have pointed to no erroneous finding of fact, errant conclusion of law, or improper application of law to fact which would support a finding that the Bankruptcy Court abused its discretion in rejecting Ms. Chiang's request to delay the sale for another ninety days, thereby further postponing resolution of a matter that had already been in court for eight years.[32]

Finally, with regard to the issue raised by the Watsons and Ms. Chiang that the unsecured

---

[31] As noted earlier, on September 17, 2010, Ms. Chiang represented that she expected the loan to close within sixty days. (09-bk-10002, Dkt. No. 68). On November 30, 2010, Ms. Chiang requested an additional ninety days.

[32] The Watsons argue that the Bankruptcy Court should have deferred to the involvement of the Congressional Delegate in the process and stayed the sale because the judicial branch "needs to consider the needs of other branches of government to do their work in this case the legislative branch overseeing the work of the USDA in the executive branch of government." (11-cv-0012, Dkt. No. 31). The Congressional Delegate's seemingly insignificant involvement in this matter provides scant support for elevating this case to one involving legal issues regarding the propriety of interactions between different branches of government.

creditors were not paid as a result of the sale, and thus the Court abused its discretion in scheduling and confirming the sale, the Court rejects this argument as well. A secured creditor, such as LPP Mortgage, need only bid "the full face value of their secured claims under § 363(k)." *In re SubMicron Sys. Corp.*, 432 F.3d at 459. It was not required to bid more. Therefore, the fact that the unsecured creditors may have received nothing from the sale does not indicate that the Bankruptcy Court abused its discretion in not allowing more time for the Debtors to obtain an undetermined amount of financing which may or may not have paid the unsecured creditors.

In sum, the Court finds that the Bankruptcy Court did not abuse its discretion in scheduling and confirming the sale, and rejects this argument as meritless.

### d.   Credit Bidding; Disproportionate Sales Price

The Watsons' final challenge to the Order Confirming Sale is that the Bankruptcy Court erroneously believed that it had no choice but to allow credit bidding and that, even if it was proper to credit bid, the amount bid for the properties was "grossly disproportionate to both the value of the assets as Scheduled and to the claims of LPP Mortgage." (Dkt. No. 31 at 36-37, citing 12/9/10 Transcript at 13-14).

Once again, the Watsons raised no objection before the Bankruptcy Court to the proposed order and the Approval Order setting forth the sales procedures, which included credit billing, although they had ample opportunity to do so.  (Dkt. No. 66 at 5; Dkt. No. 78 at 5).[33] Because the

---

[33] The Court notes that § 363(k) provides: "At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court *for cause* orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k) (emphasis added). The Debtors did not argue to the Bankruptcy Court that some "cause" existed for disallowing credit bids in this case. *See In re Barbel*, 2011 WL 3290207, at *3 (D.V.I. July 28, 2011) ("The existence of credit bids without more does not taint the sale," and "[t]he fact that the credit bids were the only offers does not render them inherently deficient.").

Watsons have raised this argument for the first time on appeal, the Court finds that it has been waived. *In re Kaiser Group Int'l, Inc.*, 399 F.3d at 565; *Hatchigian*, 574 F. App'x at 104.

With regard to the argument that the sale prices were disproportionate to the values and amounts owed, the Watsons also never raised this objection before the Bankruptcy Court. Indeed, LPP's counsel noted: "No one has suggested that that amount of money [paid by LPP Mortgage] is grossly inadequate for the assets being sold. So I have no objection before me, and therefore, I'm, I don't think I'm required to respond with respect to any ratios between bids and values." *Id.* at 6.

On appeal, the Watsons acknowledged that this issue was not raised before the Bankruptcy Court. *See* Dkt. No. 31 at 37 ("Although [the discrepancy between the amounts listed in the Claims Register and the sale price] was not discussed at the hearing, there should have been a showing of why the amount differed so dramatically from the Schedules and Claims. There may be some explanation, but none was made at the hearing therefore it was also error in this respect to confirm the sale."). If there had been such an objection, LPP's counsel could have brought the requisite figures to the Court's attention, the Bankruptcy Judge could have ruled on it, and this Court would have a record to review. Because the Watsons have raised this disproportionate sales price argument for the first time on appeal, the Court finds that it has been waived. *In re Kaiser Group Int'l, Inc.*, 399 F.3d at 565; *Hatchigian*, 574 F. App'x at 104.[34]

---

[34] Although disavowing acceptance of the valuations, LPP Mortgage noted in its brief that the only "*objective* evidence in the record of the value of the real property sold at auction" was the "latest available property tax bills" which LPP filed in opposition to the Watsons' motion to stay confirmation of the sale. (Dkt. No. 33 at 9, citing 09-bk-10002, Dkt. No. 102-4; *id.* at 10 n.19). These documents would, at a minimum, raise questions as to the validity of the Watsons' disproportionate sale price argument, which cannot be addressed on appeal in the absence of an appropriate record below. *Id.*

### 2.   The Restitution Order

Upon motion by LPP Mortgage, and after a hearing on May 12, 2011, the Bankruptcy Court signed an Order of Restitution and Order for Issuance of Writs. (09-bk-10002, Dkt. No. 116). As noted above, following the confirmation of the sale by the Bankruptcy Court and delivery of the deeds to the property, the Watsons remained on the property without any right to do so, thus preventing LPP Mortgage from taking peaceful possession. *Id.* The Court ordered the Debtors to immediately vacate the property, and allowed LPP Mortgage to have "all writs necessary to evict the Debtors and all persons claiming by or through or on behalf of the Debtors from the Property[.]" *Id.* The Watsons argue that the Bankruptcy Court lacked jurisdiction to issue the May 12, 2011 Restitution Order because: (1) the property was no longer part of the bankruptcy estate following the sale to LPP Mortgage; and (2) an eviction proceeding is not a core proceeding. (11-cv-0058, Dkt. No. 9 at 38-39).

### a.   Analysis

The Watsons attempt to re-frame the Bankruptcy Court's May 12, 2011 Order as if it decided a separate cause of action for the recovery of real property under local Virgin Islands law. *See id.* at 39 (following the sale of the Property, "[n]ow [the matter] is a dispute between private parties over the right to possession of land."); *id.* at 40 ("The statutes of the Virgin Islands create a cause of action at law rather than equity for the recovery of possession of real property and provides provisions for money damages for such" (citing Virgin Islands statutes)). However, the Bankruptcy Court's Restitution Order sought to enforce its December 27, 2010 Order confirming the sale of the Property to LPP Mortgage under 11 U.S.C. § 363. The Debtors had no free-standing claim to possession of land under Virgin Islands law and no local eviction claim spontaneously generated following the Trustee sale of the property. Indeed, the Watsons have offered no legal authority for their suggestion that once the sale occurred, the Bankruptcy Court was divested of

jurisdiction over the Sale Order, and that the only way LPP Mortgage could enforce its rightful possession of the property based on that Order would be by filing a separate claim in the local courts. Thus, their effort to evade the Bankruptcy Court's jurisdiction is unfounded. *Cf. Big Shanty Land Corp. v. Comer Props., Inc.,* 61 B.R. 272, 282-83 (N.D. Ga. 1985) (holding that bankruptcy court could enjoin transfer of bankrupt estate's property even though the property had already been transferred out of debtor's estate, where that transfer violated earlier bankruptcy court orders). "Having agreed to submit [themselves] to the Bankruptcy Court's jurisdiction [to enter the underlying Order], [Appellants] cannot opt out of proceedings to enforce the Order now." *In re AGR Premier Consulting, Inc.*, 550 F. App'x at 122. The Watsons' claim that an eviction proceeding is non-core simply has no applicability under the circumstances here.

Further, in its October 8, 2010 Order authorizing the sale of the Debtors' assets, the Bankruptcy Court explicitly retained jurisdiction "over any matter or dispute arising from or relating to the implementation of this Order or related to the Sale(s)." (09-bk-10002, Dkt. No. 78 at 6). Thus, in addition to case law, which clearly supports the existence of jurisdiction by the Bankruptcy Court to enforce its prior Sale Order, *see In re Allegheny Health, Educ. & Research Found.,* 383 F.3d at 176; *In re AGR Premier Consulting*, 550 F. App'x at 122; *In re NE Opco, Inc.*, 513 B.R. 871, 875 (Bankr. D. Del. 2014)), the Court expressly retained jurisdiction to do so.

In sum, the Bankruptcy Court had jurisdiction to enter its May 12, 2011 Restitution Order, and the Debtors' arguments to the contrary are rejected.

### b.  Related Arguments

The Watsons raise two additional arguments. They claim that the Bankruptcy Court should have "abstained from hearing this proceeding," pursuant to 28 U.S.C. § 1334(c), "out of comity to the Courts of the Virgin Islands who should be allowed to adjudicate possession of land." (Dkt.

No 9 at 40). They also assert that the Bankruptcy Court violated their "right to a jury trial on the issue of possession of the land." *Id.* at 41.

With regard to their mandatory abstention argument, the Watsons never raised the issue before the Bankruptcy Court. As a result, it is waived on appeal. *In re Kaiser Group Int'l, Inc.*, 399 F.3d at 565; *Hatchigian*, 574 F. App'x at 104.

Second, the Watsons provided no factual basis or legal analysis for their conclusion that § 1334(c)—which contains five requirements that must be met—requires abstention in this case. *See Crespo v. Abijah Tafari Immanuel (In re Crespo)*, __ B.R. __, 2016 WL 2941435, at *3 (Bankr. E.D. Pa. May 18, 2016). The Watson's summary conclusion, without any argument or citation to authorities, does not suffice on appeal and provides another ground upon which the Court finds the argument waived. *See Eddy*, 381 F. App'x at 238; *Reynolds*, 128 F.3d at 178; *Simmons*, 947 F.2d at 1065.

With regard to their argument that the Bankruptcy Court violated their right to a jury trial on the issue of possession of land, the Watsons assert they "demanded a trial by jury in the writ proceeding before the Bankruptcy Court and it was denied." (Dkt. No. 9 at 41). They then claim that the "right to a jury trial contained in the Seventh Amendment" is applicable to the Virgin Islands, citing the Revised Organic Act, 48 U.S.C. § 1561, *Warner v. Lawrence*, 754 F. Supp. 449, 453 n.2 (D.V.I. 1991), and sections of the Virgin Islands Code that, *inter alia*, incorporate the Seventh Amendment in the Virgin Islands and provide for jury trials in actions to recover possession of land. *Id.* at 41-42. They assert that the Virgin Islands statutes "create[] a cause of action at law rather than equity for the recovery of possession of real property," and that under *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989) and *Stern*, "it would seem that this right to a jury trial exists even if the proceeding is in the Bankruptcy Court." *Id.* at 42.

The Court is unpersuaded by the Watsons' argument. First, this is a proceeding in Bankruptcy Court involving a Trustee's sale of property of the bankruptcy estate under 11 U.S.C. § 363; it is not a cause of action for the recovery of real property under local Virgin Islands law. Therefore, neither the provisions of the Virgin Islands Code nor the Revised Organic Act assist them, nor does *Warner*, which involved a personal injury (private rights) action in the District Court of the Virgin Islands.

The Supreme Court held in *Granfinanciera* that parties who had not submitted a claim against the bankruptcy estate had a right to a jury trial when they were sued by the bankruptcy trustee to recover an allegedly fraudulent monetary transfer. 492 U.S. at 58. The Court likened the trustee's right to recover a fraudulent conveyance to a private rather than a public right—akin to a state law common law claim—where the parties had a constitutional right to trial by jury. *Id.* at 51-52. Adjudication of public rights claims, however, does not require jury trials. *Id.* at 51. *Granfinanciera* is completely inapposite to the instant matter, which does not involve parties foreign to the bankruptcy proceeding and which the Court has found involves public rather than private rights.

*Stern*, too, does not assist the Watsons. The question of jury trials in bankruptcy cases arose only in the dissent, which is not the holding of the Court. Moreover, it was discussed in the context of consent by the parties, which did not exist here. *Stern*, 564 U.S. at 517.

Accordingly, the Court rejects the Watsons' argument that the Bankruptcy Court violated their "right to a jury trial on the issue of possession of the land" as meritless.

## IV.   CONCLUSION

Based on the foregoing, the Court finds that the Bankruptcy Court had jurisdiction to enter the Sale and Restitution Orders, that there is no constitutional or jurisdictional infirmity in the

Bankruptcy Court having done so, or in the District Court reviewing the case on appeal. The Court also finds that all of the arguments put forth challenging the Sale and Restitution Orders are either waived or without merit.

Accordingly, the Orders of the Bankruptcy Court will be affirmed.

An appropriate Order accompanies this Memorandum Opinion.

Date: June 15, 2016

_____/s/_____
WILMA A. LEWIS
Chief Judge